THOMAS GIBBONS *against* JOHN R. LIVINGSTON.

1. Under the act of the 25th of February, 1821, entitled "A further supplement to the act entitled, 'An act to preserve and support the jurisdiction of the State,'" a citizen of this State, who has been restrained by an injunction out of the Court of Chancery of New York from navigating with his steamboat the waters between the ancient shores of the States of New Jersey and New York, may recover damages, with triple costs, against the person so restraining him.

2. Although the enjoining and restraining was, by virtue of an injunction, sued out and served before the passing of the act, and although the defendant did no act or thing, after the passing of the act, to enforce the injunction, yet his suffering it to remain in force after the passing of the act, and not dissolving it, was such a restraining and enjoining as to bring him within the words of the act.

3. The injunction issued by virtue or under color of the laws of New York, because it is those laws which create the right upon which the power of issuing the injunction was exercised.

4. *Query.* Can a citizen of the State of New York, acting within that State, and under its judicial authority, be called in question for such act in another State? As a general rule he cannot. But it appears in this case he may.

---

This was an action of trespass on the case, brought by Gibbons against Livingstone, under the statute passed 25th of February, 1820, (*Rev. Laws* 689) entitled "A further supplement to the act entitled an act to preserve and sup-

port the jurisdiction of this state," to recover damages for restraining and enjoining him, under an order of the Court of Chancery of New York, from navigating with his steamboat, the waters on the bay of New York or in the Hudson river, between Staten Island and Powles Hook. [The declaration in this case, was similar to that in the next case of *Gibbons* v. *Ogden,* except as to the dates, names, and different orders of the Court of Chancery of the state of New York, on which the suits were founded. *Quod vide.*]

This cause came to be tried before his honor, Justice Rossell, at the Middlesex circuit, in December, 1821, when the plaintiff, in support of the issue on his part, gave in evidence the following laws of the state of New York, exemplified under the seal of that state, *viz.*—1. "An act for granting and securing to John Fitch, the sole right and advantage of making and employing for a limited time, the steamboat by him lately invented," passed the 16th March, 1788. 2. An act entitled "An act repealing an act for granting and securing to John Fitch the sole right and advantage of making and employing the steamboat by him lately invented," passed on the 27th March, 1798. 3. An act entitled "An act relative to a steamboat," passed the 5th April, 1803. 4. An act entitled "An act to revive an act relative to a steamboat," passed the 6th April, 1807. 5. An act entitled "An act for the further encouragement of steamboats on the waters of this state, and for other purposes," passed the 11th April, 1808. 6. An act entitled "An act for the more effectual enforcement of the provisions contained in an act entitled an act for the further encouragement of steamboats on the waters of this state, and for other purposes," passed the 9th April, 1811.

The plaintiff then gave in evidence a bill of complaint, which was exhibited by John R. Livingston against Thomas Gibbons and Aaron Ogden in the Court of Chancery of New York, which bill sets forth at large, all the several acts of the state of New York, before mentioned. The exclusive privilege granted under those laws, to Robert R. Livingston

Gibbons *v.* Livingston.

and Robert Fulton, of " making, using, employing and navigating all and every species or kind of boats or water craft which might be urged or impelled through the water, by the force of fire or steam, in all creeks, rivers, bays and waters whatsoever, within the territory or jurisdiction of the state of New York." The assignment by Robert R. Livingston and Robert Fulton, to John R. Livingston, of the exclusive right to navigate from any place " within the city of New York, lying to the south of the state prison and the Jersey shore, and Staten Island, which lies to the south of Powles Hook Ferry, and to the south of Sandy Hook, to wit, to Staten Island, Elizabethtown Point, Perth and South Amboy, and the river Raritan, up to Brunswick." And then states " that Thomas Gibbons, in contravention of the exclusive right and privilege of the said John R. Livingston, to navigate the waters of the state of New York, had set in motion on the waters of that state, and within the jurisdiction thereof, a certain steamboat called Bellona, which boat was employed and intended to be employed in the transportation of passengers between Elizabethtown aforesaid, and New Brunswick, and actually navigated the waters of the state of New York, between Elizabethtown Point aforesaid, and New Brunswick aforesaid, and had lately and within a few days, navigated the waters of the state of New York, between Elizabethtown and Powles Hook, and between Powles Hook and the city of New York," and concluded with " praying an injunction against the said Thomas Gibbons and his agents, captains, &c., to restrain them from using, employing and navigating the said steamboat Bellona, or any other steamboats, on the waters of the state of New York, between that part of the city of New York, south of the state prison, and any part of Staten Island, or the shore of New Jersey, south of Powles Hook Ferry." [The bill also set forth charges against A. Ogden, for violating the exclusive right of complainant, but these it is thought unnecessary to detail.]

Gibbons *v*. Livingston.

Then the plaintiff gave in evidence the answer of Thomas Gibbons to the bill of complaint of the said John R. Livingston, by which the said Thomas Gibbons denies that the said complainant hath any exclusive right to navigate or run a steamboat or boats, or boats propelled by the power of steam or fire, from the city of New York to Brunswick, as aforesaid ; and admits, that he is the owner of a steamboat called the Bellona, in the said bill of complaint mentioned, and that the said steamboat called the Bellona, before the time of filing the said bill of complaint of the complainant, being moved and propelled by steam, was intended to be employed and navigated, and run between the city of New York and the wharf of this defendant, in the state of New Jersey, at a place usually called and known by the name of Halsted's Point, which is within the bounds of the township of Elizabethtown aforesaid, but is separated from Elizabethtown Point by a large and navigable creek ; and that the said steamboat, in navigating and running to and from the said city of New York and this defendant's said wharf, in the state of New Jersey, and within the bounds of the said township of Elizabethtown, would cross and pass over waters of the state of New York, and insists, might lawfully and rightfully be done, without any license therefor from the complainant, or from the said Robert R. Livingston and Robert Fulton, or any person or persons deriving title under them or either of them. But that the said steamboat, called the Bellona, never was begun to be employed, navigated and run between the said city of New York and this defendant's said wharf at Halsted's Point aforesaid in the said state of New Jersey ; but that he, this defendant, some time in the month of March last past, began to run his said steamboat, the Bellona, on the waters lying between the Jersey shore and Staten Island from New Brunswick to Elizabethtown Point, navigating therein the water of the Raritan river, and those lying between the New Jersey shore and Staten Island, commonly called the Sound,

Gibbons *v.* Livingston.

from one port to another port, both within the limits and jurisdiction of the state of New Jersey. And that he still continues to navigate and run his said steamboat, called the Bellona, from New Brunswick aforesaid, in the state of New Jersey, on the waters of the Raritan river, and the said waters lying between the Jersey shore, and Staten Island, called the Sound, as aforesaid, to Elizabethtown Point aforesaid, or other points or places within the jurisdiction of the said state of New Jersey. And admits, that since he began to employ and run his said steamboat, called the Bellona, in the navigation aforesaid, she has occasionally, on her passage from New Brunswick aforesaid, been continued and run from Elizabethtown Point aforesaid, direct to the dock or wharf at Powles Hook at the city of Jersey, in the state of New Jersey, from thence running again direct to Elizabeth-town Point, aforesaid, the same being a navigation from one port to another port, both within the limits and jurisdiction of the said state of New Jersey, and insists, not upon or over any water exclusively within the limits and jurisdiction of the state of New York, the waters lying between Elizabethtown Point aforesaid, and Powles Hook at the city of Jersey, not being, as this defendant conceives and insists, exclusively the waters of the state of New York, nor within the exclusive jurisdiction of the said state, but being common both to the state of New Jersey and the state of New York; and denies, that the said steamboat, called the Bellona, now is, or ever was used, employed, navigated, or run over any waters, or to, or from, or between any place or places, or point or points, or for any purpose, or in any manner whatever, in contravention of any exclusive right or privilege whatever of the complainant. And that he admits that in running his said steamboat from New Brunswick to Elizabethtown Point, and from Elizabethtown Point to New Brunswick, as aforesaid, he takes passengers therein, who are desirous to go with their goods and baggage to and from the said places. And that the said steamboat Bellona, is,

and during all the time of her said before mentioned navigation and employment, was, a vessel above twenty tons burthen, duly enrolled at the port of Perth Amboy, in the state of New Jersey, in the manner and form in such case required by the laws of the United States of America in that behalf, and duly licensed to be employed in carrying on the coasting trade, according to the . laws of the United States, in such case made and provided. And that the said steamboat, called the Bellona, being of the burthen of one hundred and sixteen and thirty-five ninety-fifths tons, or thereabouts, was duly enrolled, according to law, at the said port of Perth Amboy, in the state of New Jersey, on or about the twentieth day of October, in the year one thousand eight hundred and eighteen. And that the said steamboat, or vessel, called the Bellona, hath, ever since she was so enrolled, continued, and that she now is, a regularly enrolled vessel, within the true intent and meaning of the laws of the United States of America, for enrolling and licensing ships and vessels, to be employed in the coasting trade and fisheries, and for regulating the same. And that the said steamboat or vessel, called the Bellona, was, at or about the time of the said enrollment of her, as aforesaid, duly licensed for carrying on the coasting trade for one year, in manner and form by law required; and insists, that the said steamboat, called the Bellona, during all the time that the said last mentioned license has continued and been in force, lawfully might, and, while the same shall continue in force, lawfully may, be employed under the same in carrying on the coasting trade; and that the said steamboat, called the Bellona, whether moved by steam or fire, or otherwise, may lawfully be navigated and employed under the said license, while it continues in force, in any lawful trade or employment permitted by the laws of the United States to vessels duly licensed to be employed in carrying on the coasting trade between different ports of the state of New Jersey, or between ports or places in the state of New Jersey and ports

and places in the state of New York, and for that purpose navigate any waters within the jurisdiction of either of the said states, notwithstanding the said pretended exclusive right and privilege to navigate the waters of the said state of New York with boats moved by steam or fire, claimed to be vested in him, the complainant, in the manner in his said bill of complaint for that purpose set forth, and without any permission or license from him, or from any other person or persons, for so doing."

Then the plaintiff read in evidence an order of the Chancellor of the state of New York, dated the 3rd of May, 1819, by which it was ordered, " that the motion for an injunction to restrain the defendant, Ogden, be denied; and that the motion as to the defendant, Gibbons, be also denied, so far as respects the navigation of the sound, between Elizabethtown Point and Amboy, in the state of New Jersey; and that it be granted only so far as to restrain and enjoin the defendant, Gibbons, from navigating, with any boat or vessel propelled by steam or fire, the waters in the bay of New York, or in the Hudson river between Staten Island and Powles Hook*."

The plaintiff also read in evidence a petition to the said Court of Chancery of the state of New York, by the said John R. Livingston, in the said suit between the said John R. Livingston, complainant, and Thos. Gibbons and Aaron Ogden, defendants, which petition set forth, "that the said John R. Livingston had exhibited a bill of complaint against the said Thomas Gibbons, in the Court of Chancery, of New York, and that an injunction had issued thereon against the said Thomas Gibbons;" and then set forth the act of the state of New Jersey, of the 25th February, 1820, (Rev. Laws 689); and that the said Thomas Gibbons had prosecuted attachments under that act against the boat of the said John R. Livingston; and that his son, Montgomery

*See 4 John. Chan. Rep. 48.

Livingston, had, without the consent of the petitioner, John R. Livingston, obtained an order of the Court of Chancery of New York, for dissolving the injunction which had issued in the above mentioned cause against the said Thomas Gibbons, and prays that the said order may be vacated, and a new injunction allowed. The chancellor rejected this petition, and refused to restore the injunction.

And the plaintiff further proved, by C. Vanderbilt, that he was the owner of the steamboat Bellona; that the said steamboat was, and always had been, a coasting vessel, regularly enrolled and licensed under the laws of the United States; that the said plaintiff was a citizen of this state; that the said injunction was, in June, 1819, served on the witness, (he being then master of the said steamboat Bellona) on board the said boat, while she was lying at Staten Island; and again, in New York, in March, 1820; that within a few days after the service of the said injunctions, the witness informed the plaintiff of the same, and gave him copies of said injunctions; that between the 1st and 5th of April, 1820, the witness, at the request of the plaintiff, applied to John R. Livingston, the defendant, to state, whether he meant to continue to restrain the plaintiff, Thomas Gibbons, under his injunction aforesaid, from navigating with the said steamboat, the Bellona, the waters on the bay of New York, between the ancient shores of the states of New Jersey and New York? and that said Livingston replied, he should give no answer. The plaintiff gave some further testimony, shewing the length of time he was prevented running his boat, by means of the injunction aforesaid, and the damage he had sustained in consequence thereof.

To the whole of the evidence thus given on the part of the plaintiff, the defendant demurred.

At the May term of this court, the argument of this demurrer came to be heard, when

*R. Stockton,* in support of the demurrer, said, this is an action on the statute of New Jersey, passed the 25th Feb-

ruary, 1820, entitled "A further supplement to the act entitled an act to preserve and support the jurisdiction of this state." *Rev. Laws* 689. The third section of that act enacts, "that if any citizen of the state of New Jersey shall hereafter be enjoined or restrained by any writ of injunction or order of the Court of Chancery of the state of New York, by virtue, or under color, of any act of the legislature of that state, from navigating with any boat or vessel, moved by steam or fire, belonging or to belong, in part or in whole to him, the waters between the ancient shores of the states of New Jersey and New York, the plaintiff or plaintiffs, in such writ or order, shall be liable to the person or persons aggrieved, for all damages, expenses and charges occasioned thereby, to be recovered, with triple costs, in an action of trespass or trespass on the case, in any court having cognizance thereof, or by a writ of attachment, in case the plaintiff or plaintiffs in any such writ or order of the Court of Chancery of the state of New York, shall not be resident in the state of New Jersey." This act is not to go into operation until the 1st of April, 1820. To bring the defendant within this act, the plaintiff avers, that the defendant, upon a bill filed by him in the Court of Chancery of New York, did, in May, 1819, obtain an order for an injunction. The proof is, that the injunction was served within the state of New York, in June, 1819, by leaving a copy thereof with the master of the plaintiff's boat, Bellona, on board the said boat, while she was lying at Staten Island; and again in March, 1820, in New York, by putting up a copy of the said injunction on a conspicuous part of the said steamboat; and that between the 1st and 5th of April, 1820, the agent of the plaintiff, Gibbons, called on the defendant to know, whether he meant to continue to restrain the plaintiff, under his injunction, from navigating with his steamboat, the Bellona, the waters on the bay of New York, between the ancient shores of the state of New Jersey and New York?

To which enquiry the defendant made no answer. These are the only acts of interruption of which the plaintiff complains.

The general question is, whether, upon this law and these facts, this suit can be sustained ? I shall hereafter contend, that the statute upon which this action is founded is unconstitutional and void ; but shall, at present, consider the case as if the statute was free from any such objection, and shall inquire, whether the defendant has been brought within it.

I. The plaintiff has not shewn in evidence, that the defendant, by any process of injunction, restrained or enjoined the plaintiff from navigating the waters between the ancient shores of New Jersey and New York, after the 1st of April, 1820. This is absolutely necessary. The proviso suspends the whole operation of the law, until the 1st of April, 1820. It is no law until then ; it cannot be broken but by some act done after that time ; it does not extend to the case of an injunction sued out before the 1st of April, when no proceedings have taken place to enforce it after that day. The third section is prospective in its very terms. It makes use of the words, " if any citizen shall *hereafter* be enjoined," &c. It was incumbent on the plaintiff to shew, that after the 1st of April, the *defendant enjoined or restrained him.* The act requires it ; the declaration avers it. This could be shewn only by proving some express substantive act of defendant, after the 1st of April, 1820, to restrain or enjoin the plaintiff ; or that he had taken out or served an injunction, or tried to enforce the former by a seizure, or application for an attachment after that time. What is the testimony ? That the injunction was taken out in May, 1819, served in June, 1819, and set up on board the Bellona in March, 1820. None of the acts will bring the defendant within the words of the law. All he did, after the 1st of April, was to refuse to answer ; he stood mute, and for this, instead of being pressed to death, according to the old judgment of *peine forte et dure,* the plaintiff, very mercifully,

asks only all the damages, with triple costs. This evidence is palpably insufficient. He had a right to hold his tongue. People often get into difficulty by talking too much, but I never before knew of a person bringing himself within the purview of a penal statute by holding his peace. Will his remaining silent stand for the act, the positive act of restraint? He was not bound to answer to any question put to him by plaintiff, much less was he bound to answer the question put, " whether he meant to continue to restrain the plaintiff from navigating the waters *in the bay of New York, between* the ancient shores of New Jersey and New York?" The question was not, whether he meant to restrain him from navigating one-half of the Hudson, or such part of the bay as is claimed by New Jersey, as her territory? but the waters of the bay of New York? including what notoriously belongs to the state of New York, up to their wharves, evidently setting up the absurd pretence of the act of 1811, that New York had no right to grant an exclusive right to the use of her own waters. All that was done, by way of restraint, was done before the existence of the law. He was not bound to retrace his steps, to dissolve his injunction, or to give notice that he would not enforce it; the law does not require it. Plaintiff had no right to impose it on him. To keep out of the penalties, he had only to do no more. If Gibbons had come into New York, and defendant had seized his boat, or served another injunction, there would have been a case within the act. But he did not. Why? He was fearful of the consequences; it was his own fears and apprehensions, then, which occasioned the fact, of his boat being laid up, and no act of the defendant, after the law was in force. To make an injunction, taken out and served before April, 1820, the ground of this suit, *is to prove the law unconstitutional.* It was lawful to sue out an injunction, awarded by the court, and served in New York, until April, 1820. When done, there was no law against it. To make it the foundation of penal proceeding, is to give it precisely *an ex post facto operation.*

II. If this injunction had been taken out after the 1st of April, 1820, is it *such an injunction* as is prohibited by the act? *Rev. Laws* 689. The injunction prohibited is one awarded by the Court of Chancery of New York, by virtue, *or under color, of an act* of the legislature of the state of New York. Such is the precise description of the process our act meant to countervail. Inflated and deceived, as the legis-lature might have been on this subject, they never meant to set themselves in array against a sister state and her regular tribunals; they only meant to meet the *extraordinary reme-dies* given by New York to guard the exclusive title she had granted. The express provision, the *casus fœderis* is, that the citizen of New Jersey shall be *enjoined* or *restrained* by injunction *sued out in virtue, or under color, of an act* of the legislature of the state of New York.

The legislature, no doubt, were led to believe that the statutes of New York gave this process by express enact-ment, to prevent any Jersey steamboat from navigating; or, seeing the progress of legislation in New York, they appre-hended that, by statute, its legislature might order the chancellor to issue such injunction. Upon this state of things existing, or which might happen, they provide, that if any interruption occurs *by virtue, or under color*, of such legis-lative act, the consequences shall ensue. This act is levelled against interruptions under pretence of positive legislative provisions. The injunction denounced is a statutory injunc-tion merely, not an injunction issuing as of common right, according to the law and practice of a Court of Chancery. Our legislature only provided a countervailing remedy, by statute, for a supposed statute remedy given by New York, to protect the exclusive right.

Has the plaintiff given in evidence any injunction *issued by virtue of, or under color of a statute of New York?* Has the chancellor of New York, in awarding this injunction, produced on the ground, that this remedy is given by statute? No such thing. How does the plaintiff get over this in his

declaration ?   He recites the statutes giving *the exclusive right* to Livingston and Fulton; statutes which constitute merely *the title* of the party to the exclusive right or franchise.   But he does not shew, nor can he, that these acts direct the chancellor to award an injunction.

There is a statute of New York directing an injunction, and this provision, not understood at the time, probably produced the wording of our act.  The only statutory injunction of New York is given by the act of the 11th April, 1811, which relates to another subject.   In April, 1808, the legislature of New York, to protect the exclusive right, forfeited to Livingston and Fulton, and their associates, all boats infringing that right ; and by the act of 1811, they give the remedy of trover to recover the boat so forfeited, and enact, that pending this action, the chancellor shall, by injunction, prevent the removal of such forfeited boat.   All this is bottomed on the forfeiture, and the action of trover to recover it.   Now, Livingston's bill in chancery is not on this ground at all.   There is no averment in the declaration, nor testimony to bring it within the case in which a statute of New York orders an injunction.

This injunction, then, was issued not in virtue, or under color, of a legislative act of New York.  How was it issued ? What is its foundation ?   It was awarded by the chancellor of New York, setting in his court of equity, dispensing the law on principles of common right, according to the general law of that court.   The acts of New York, set out in the declaration, and in the defendant's bill, are merely the title which the defendant, and those under whom he claims, have to the exclusive privilege.   They are nothing more than grants on deeds from a public body to an individual.   They merely give title ; they provide no remedy ; they direct no injunction.   How then can it be said, that the chancellor awarded this injunction by virtue, or under color, of an act of the legislature ?   If a complainant sets out his title deeds and prays an injunction, can it be said that the injunction is

by virtue, or under color, of the deeds? The principle on which it was granted is one fully established, and fundamental in this branch of the law, *viz :* that if a person is *in possession* of an exclusive right or privilege, he shall not be disturbed until his title has been tried and overruled. 9 *John.* 587.

Then, if the law is valid, we are not within it. 1. He did nothing contravening its provisions after it took effect. 2. No such statutory injunction, as is contemplated by the act, has been sued out at any time.

But I shall now contend, that this section of the statute, upon which this action rests, is void in respect to the interruption in New York, because it violates the constitution of the United States in two distinct grounds ; and these points, though they cover only the interruption in New York, yet will bar the plaintiff of his suit. What does the third section ordain? How does it give cause of action against the defendant? What has he done to make him liable in a penal action in New Jersey? He, being a citizen of New York, has filed a bill in the Court of Chancery ; obtained, by judicial proceeding, an injunction, and served it on the plaintiff, within the state of New York. He is called in question, not only for enjoining the plaintiff in New Jersey, but also in New York. I acknowledge, that if I am wrong in my two first points, that the third section covers this case upon the construction the plaintiff must give it. But had the legislature a constitutional right to pass the law? I deny it. It is not in the power of the legislature of one state to pass laws against the citizens of another. The legislature of New Jersey have no constitutional right to give an action against a citizen of New York, because he has, in a regular course of law, impleaded a citizen of New Jersey in New York, and obtained the remedy a court of justice has decided that he was entitled to. In short, a citizen of New York cannot be questioned, and be made liable to penalties in New Jersey for a judicial proceeding in New York,

in a case clearly within the jurisdiction of the court. But as the sentence and award of the court would have been a full defence and protection against any suit for damages in New York; so it is in New Jersey. *4th article of the Constitution of the United States.*

The act of Congress declares, that the judicial proceedings of any state shall have the same credit and effect in every other state, as it has in the state where the proceeding was. This part of the constitution has received the proper decision in the Supreme Court of the United States. 7 *Cranch.* 481; 3 *Wheat.* 234.

Then all we have to do is to ask, what would be the effect of this award of the chancellor, and of this injunction in New York? Would it not be a complete indemnity? how can it be any thing less in New Jersey? The act, then, construed as the plaintiff's counsel does, and must, construe it, in making penal a judicial act of New York, executed there, by a citizen of New York, is void.

2. The act of February, 1820, if it means what the plaintiff asserts it does mean, and as its words seem to import, to subject a citizen of New York to this action here, for enjoining or restraining a citizen of New Jersey from navigating by steam *any of the waters between the ancient shores of New York and New Jersey,* even though those waters are confessedly within the jurisdiction of New York; if this is the intent of this third section, it is radically and totally unconstitutional, as repugnant to the rights of a sister state and against the spirit and expressions of the constitution of the United States.

Here I assume the constitutionality of the monopoly laws of New York. Their legislature had a right to reward the persons who brought steamboats into practical use, by giving them the exclusive right in their own proper waters. This cannot be here denied. The constitutionality of those laws has been decided by the proper tribunal; it remains law, until altered and reversed. In New Jersey we claim and

exercise the right. *Stevens' law.* Every state claims the same, as part of its sovereignty. Our legislature solemnly recognized them as constitutional when they repealed the act in favor of Ogden and Dod. Besides, the plaintiff, in suing on this statute, must concede the constitutionality of the New York laws, for the statute on which his action rests is precisely the same as the enforcing laws of New York. If, then, New York has enacted a constitutional law, how can New Jersey, by an act of their legislature, declare that a citizen of New York, acting under that act, shall be subjected to a suit here for so doing? To legislate over its own territory, is an essential attribute of sovereignty, and, therefore, it is not competent, upon general principles, for another state to attempt to control a legal act by passing countervailing laws. If there is any one principle most fundamental in the scheme of the American confederacy, it is the absolute sovereignty of the states to regulate their own territory in all cases not interdicted by the constitution of the United States.

But it will be said, that New York has gone further, and claims jurisdiction in the proper waters of New Jersey; that, by contruction, her courts extend these acts to all the dividing waters, though the terms of their laws confine them to the waters of New York. Admitting it to be so, this forms no ground to sustain our act. We have no pretence of claim to any right to legislate over the proper waters or territory of New York; and because New York makes claim without title, it cannot enable us to make criminal *here* a legal act *there.* The laws of New York are before us : on their face they are perfectly correct; confined to their own territory. Because they claim part of our territory, by a title which they think good, and we bad, does this give a right in us, a right to prohibit or punish an act done within their proper territory, as acknowledged by us?

Again, it will be said, that New Jersey has, and does assert, a right to the free navigation, even of the waters of

New York, and denies to New York the right to impair it in any manner, even by such regulations as these; and this may require a review of these laws for the support of the jurisdiction of this state.

The controversy between this state and the state of New York arose thus: The duke of York grants to Berkley and Carteret "all that tract of land adjacent to New England, to the westward of Long Island and Manhattan Island, bounded on the east part by the main sea and part by Hudson river, and hath on the west Delaware bay or river, and extendeth southward to the main ocean, as far as Cape May, and northward to the northenmost branch of the Delaware, at 41 degrees 40 minutes of latitude, and crosses over in a straight line to Hudson river." New York says, that this boundary excludes the Hudson and New York bay, &c. And they deduce title under the duke for all to the east and north of the New Jersey line. New Jersey, though she cannot insist on her specific boundary covering these waters, says, that they could not pass as a general residuum; that it is the simple case of a mighty water flowing between two states, each has a right *ad filum aquæ.*

Commissioners were appointed, in 1806, to settle this controversy, but the attempt proved abortive. The New Jersey commissioners claimed *ad filum aquæ.* They reported, and the legislature gave their sanction to the claim set up by the commissioners.

On the 3d of October, 1807, they passed the first act to support the jurisdiction of the state, (*Rev. Laws* 533) in which they assert the rights of this state, and put them upon solid and satisfactory ground. The claim is only *ad filum aquæ.* This was a wise and just law; *it means what it professes,* to support the jurisdiction of the state, and stops there. This is the mother act, but some of the offspring which they gave her were spurious, and engendered for very different purposes.

In January, 1811, (*Rev. Laws* 547) the steamboat business came up, and the legislature departed from the true legal con-

stitutional ground, and set up one rotten and unsound. "And whereas, the citizens of New Jersey have a full and equal right to navigate, and have, and use vessels or boats *on all the waters lying between the states of New Jersey and New York,* in all cases whatsoever, not prohibited by the constitution of the United States." This denies the right of New York to pass these laws, by asserting a full right to all sorts of navigation in New Jersey on the waters of New York, and is bottomed on the opinion, that by the power given to congress to regulate navigation and the coasting trade, the states were deprived of the power to pass any acts giving particular privileges. This is altogether erroneous, and is otherwise decided. Then, as a general principle, without reference to the constitution, this assertion is baseless, for, by the public law, the jurisdiction is *ad filum aquœ,* and each has a right to regulate its own. Upon this ground rests ferries and tolls, &c.

Yet this rotten steamboat principle is adopted in this very act of February, 1820, (*Rev. Laws* 689) to support the jurisdiction of the state, and its provisions apply to acts on all the waters between the two states. 2nd section—"any of the waters between the ancient shores," &c. 3d section—"*the waters,*" that is to say, "any of the waters." It is palpable, then, that in this act of February, 1820, the legislature set up the same claim as in that of 1811, and on the same ground, to wit, that, by the constitution of the United States, the states are deprived of the power of passing such acts. But this is a mistake altogether. New York had a right to regulate her own waters so as to give citizens an exclusive right, for a limited time, to a new species of navigation. And having this right, the legislature of New Jersey can have no constitutional right to punish a man for setting up and maintaining his title under such act.

It may again be said, that this provision is retaliatory; that New York had, by their acts and judicial opinions, considered acts done in the waters of New Jersey as contrary

Gibbons *v.* Livingston.

to their laws, and had authorized seizure of boats for navigating with steam in those waters; and, upon the principle of retortion or reprisal, our legislature might, and have done the same. I deny the right of one state of this Union to adopt, against another, the doctrine of retortion and reprisal, both on the ground, that such conduct is against the principles and terms of the constitution of the United States, and upon general principles of public law.

Our political system is that of a confederated republic, no state stands alone. There are relative rights arising out of this organization, different from those which exist between foreign nations. The peace and happiness of the whole, the very existence of the Union, requires that the legislative acts of one state should not be under the legal control of another. A system of hostile legislation between the states is inconsistent with the national constitution. One great object of that was, to put an end to it, to erect a barrier against the belligerent legislation of different states. Strong indications of such a disposition had shewn itself. It was seen that such a state of things was incompatible with the tranquility and permanency of the Union. The consequences were certain; each state would defend its own claims, and its own citizens. The injured would apply for redress; retaliation and reprisal would be resorted to; they would begin with words, and end with blows. To prevent all this, the constitution takes from the states those powers, the imprudent exercise of which would most likely produce this state of things, as the power of making tender laws, *ex post facto* laws, laws violating contracts, laws of reprisal or war. Full faith and credit are to be given to the public acts or laws of each state in every other.

Now do not these provisions, in their very terms and principles, condemn and put down all retaliatory legislation? If there can be neither reprisal or war, and if full credit is to be given to the legislative acts of each state in all the rest, how can they be met and controlled by respondent

legislation? In truth, it seems that our legislature have the same right to declare war against New York; and the act of 1811 is substantially an act of marque and reprisal, authorizing the seizure of the boat of any citizen of New York. 6 *Cranch* 137, 138, 144. In the chancery case in New York, Kent considers all these acts retaliatory and void. *Livingston* v. *Gibbons*, 4 *John. Chan. Rep.* 571.

Then it may be asked, must New Jersey and her citizens submit? is there no redress? The answer is at hand; she has all the remedy that is consistent with her own interest, and that of her citizens. Is the injury to the state? does New York claim, and are these proceedings by their legislature infringements upon part of our territory? If it is so, the constitution has given the remedy. *Constitution of the United States, art.* 3, *sec.* 1. It has erected a tribunal, which is a common arbiter for determining questions of this kind. Why not proceed against New York in the Supreme Court of the United States? If a citizen of New Jersey is unjustly vexed under an illegal act of the legislature of New York, the courts of the United States are open to him. The right to resort to that tribunal is vested by the constitution; it is not dependent on Congress. Congress cannot prevent the operation of this section of the constitution. If they will not pass a law declaring how process shall be served on a state, the Supreme Court, upon a bill filed, would make the proper rules to bring in New York.

The rule stated in 3 *Dallas* 335, is still in force, applicable to all cases in which a state may yet be sued. These acts of ours are not even within the doctrine of retortion, as stated by the writers on public law. That right exists only between *foreign nations who may make war*, and is intended to precede or prevent it. And what is it? If one nation oppresses the subjects of another, residing in its territory, the nation whose subjects are injured may do the same to the subjects of the other, resident in the injured country. It grows out of oppressive legislation against the individuals

of a particular foreign nation, by which they are put on a worse footing than the citizens of the country where they are, or other foreigners. But a municipal law, binding every body, cannot be the subject of retortion or legislative reprisal. Now the laws in question are of this character, general, binding every body.

If, then, this act of 1820 does mean to give an action against a man for enjoining a citizen of this state for navigating any of the waters between the ancient shores of New Jersey and New York, though those waters are within the acknowledged territory of New York, it is void, and void *in toto*. It is void although the interruption was in New Jersey, for a section in a statute containing a single connected proposition, if void because extended too far, must be altogether void; you cannot divide it. This declaration goes for the whole; the *gravamen* is, that he was interrupted from navigating between the ancient shores. The court could not divide it, nor the jury, in an assessment. Upon the whole case it is then submitted, that the defendant is entitled to judgment on this demurrer.

*Wood,* in answer. In this action two distinct subjects are presented for the consideration of the court. 1. Supposed defects in the cause of action, which, if they really exist, must arrest the judgment. 2. A supposed failure on the part of the plaintiff to prove the issue on his part, by the facts exhibited in the demurrer to evidence. If the issue is completely proved, but the cause of action is defective, the judgment will· be arrested, and each party pay his own costs. If the cause of action is good, but there is a failure in the proof, judgment will be rendered for the defendant, with costs.

I shall answer all the objections taken to this suit by the defendant's counsel, though not in the order in which he has stated them. The action itself is by him considered

defective, because the act of New Jersey, on which it is founded, is unconstitutional. This is the only objection to the cause of action, as spread upon the record.

. The act on which this suit is brought, is only a part of a system pursued and adopted by our legislature, for the purpose of resisting what they consider an unfounded claim on the part of New York to the exclusive right to all the waters of the bay of New York and of the Hudson river. All the acts of our legislature, upon this subject, are to be taken together. They are in *pari materia*, and a view of the whole will throw light upon the construction of the one now in question.'

The laws of New York give to Fulton and Livingston, and their assignees, the exclusive right to navigate with steamboats all the waters of the state of New York. By an act passed in 1808, New York asserts an exclusive right to the waters of the Hudson, including the bay of New York. *Livingston* v. *Gibbons and Ogden, John. Chan. Rep.* 48.

In this argument I shall not bring in question the constitutionality of the New York laws, which give the monopoly to Fulton and Livingston. It is unnecessary for my purpose. Still, as interpreted and enforced in their courts, they are manifestly oppressive in their operation upon the citizens of New Jersey.

1. They prevent our citizens from navigating with steamboats from a port in New Jersey to a port in New York, and confine such navigation to their monopolists. A state, in creating such monopolies, should confine it to the navigation from port to port in their own territory. The communication between the ports of New York and New Jersey, with steamboats or otherwise, should, in fairness and justice, be restrained and modified (where it is proper so to do) not by the acts of one state, but by the concurrent acts of both. It is no answer to say, that this monopoly to Fulton and Livingston was upon a meritorious consideration. New

Jersey should have been consulted, and had a right to judge for herself. When New York dispenses her favors, though *meritoriously*, she should not do it at the expense of her neighbors. The effect of this New York monopoly, before our legislature interfered, was to give to Fulton and Livingston, and their assignees, the exclusive navigation, with steamboats, of all our waters, so far as respected the communication in that way between the two states. Hence those monopolists granted the exclusive right of such navigation to one, in our waters adjacent to Elizabethtown, to another in the river Raritan, to a third in the waters of Monmouth county.

2. These New York monopoly laws, in the way in which they are enforced, prevent the citizen of New Jersey from navigating, with steamboats, the waters of the bay of New York and part of the Hudson river, over part of which we have an exclusive territorial right, and over all of which we have a right of navigation, in common with the state of New York and her citizens.

These are the injuries growing out of the operation of the New York laws, of which New Jersey complains. To redress these injuries, the law in question, on which this suit is founded, and all the other acts relating to the subject, were passed. They have produced a good effect; steamboats, owned by our citizens, are constantly plying, under their protection, between our ports and the ports of New York. The price of a passage in a steamboat from New Brunswick to New York is about one-third of what is was formerly, when the New York monopolists excluded our citizens. These acts of our legislature were not passed in heat and without deliberation; they are part of a system of legislation long pursued in New Jersey, under the sanction of all parties, the object of which is to resist the encroachment on the part of New York. Steamboats are particularly protected, only because the claims of New York, so unwarrantable, were brought practically to bear upon that subject.

The law in question is constitutional, and our legislature were authorized to pass it for the purpose of repelling and obviating both of the injuries above stated.

1. Admit the laws of New York creating this monopoly are constitutional, and even that the exclusive claim of New York to the Hudson river and bay is valid, and that the decrees of her chancery are valid, yet I shall contend, that New Jersey had a right to pass the law in question to repel their oppressive operation upon their citizens, by excluding them from an equal right of navigation, with steamboats, between the ports of the two states.

This law is an act of retortion. *Vattel B.* 2, *ch.* 18, *sec.* 341, *p.* 283, *et vide sec.* 339. As between independent states, such a power unquestionably exists. If we are deprived of it by the federal constitution, the defendant must shew how. An act is presumed to be constitutional, unless it is clearly shewn to be otherwise. 9 *John.* 564. Powers not delegated to the United States, nor prohibited to the states, are reserved to the states or the people. *Vide amendment to the Federal Constitution, art.* 10. The rights of a state remain after the adoption of the constitution as before, except where they are abridged by that instrument. *Sturges* v. *Crowninshield,* 4 *Wheat.* 193. There must be a direct incompatibility between the power granted to the federal government, and the exercise of it by a state to deprive the state of it. *Houston* v. *Moore,* 5 *Wheat.* 17. *Federalist,* No. 32. 9 *John.* 576. From these authorities we may extract two rules of construction, which will safely guide us through this labyrinth. 1. A power not granted to the United States government is reserved to the states. 2. A grant of power to the United States government does not destroy the exercise of the same power by a state, unless there is a manifest and direct repugnancy, and until they are brought practically into collision.

To establish the unconstitutionality of the law of New Jersey on which this suit is brought, the defendant must

shew, either that it was prohibited by some clause in the federal constitution, or that there is a direct and manifest repugnancy between it and the exercise of some power granted to the federal government. Several clauses are relied on, none of which will answer his purpose.

It is not repugnant to the power given to congress to declare war, and to grant letters of marque and reprisal. When the powers of the constitution prohibited the states from declaring war, they meant war in its strict and usual signification. It did not embrace the power of granting letters of marque and reprisal, or they would not have mentioned the latter in express terms. This shews that that instrument is cautiously worded; that terms are used appropriately; and that a fanciful construction ought to be avoided. Acts of retortion are not acts of war; they are pacific. When resorted to between independent states, they are intended to prevent the necessity of resorting to war. Nor can the passing of such an act be considered a granting of *letters of marque and reprisal.* Letters of marque and reprisal are a commission to attack the subjects of a foreign state on the high seas beyond the limits of the state, seize their property, and put it in sequestration. It is a hostile act of aggression. *Marten's Law of Nations*, 270. 1 *Black. Com.* 258. These terms were perfectly understood by the framers of our constitution, and they are used in the sense in which they are ordinarily understood by enlightened jurists. They did not think the prohibition to declare war embraced the granting of letters of marque and reprisal, nor that the latter embraced an act of municipal legislation, in its nature pacific, and intended to operate within the jurisdictional limits of the state. The defendant's counsel says, that one great object of the federal constitution was, to create a barrier against the conflicting legislation of different states. If this object had been in their view, they certainly would have used terms expressly to convey that idea, and not put the counsel to the trouble of collecting it

by inference and ingenious conjecture. But it is said, that this conflicting legislation might lead to war. This, however, cannot take place, for the sword is taken from the states. They may legislate as much as they please, but they cannot fight. If a state is bound to submit to the oppressive legislation of a foreign state, it is more likely to lead to rebellion than if she can defend herself by counter legislation. Many acts are oppressive upon a neighboring state and yet are constitutional, and, of course, no redress can be had in the federal courts. Many acts of a state may be lawful in themselves, and yet injurious to another. *Vattel* 283. Important sovereign powers are reserved to the states, which are intended as checks to the federal government, and, of course, cannot be controlled by that government, or they would be no longer acts of sovereignty. Some inconveniences may result from this state of things, but they are overbalanced by the advantages. That a confederated republican government must be thus checked and limited, to exist over an extensive territory, is an opinion sanctioned by the ablest writers and by all experience. The opinion of Chancellor Kent (4 *John. Chan. Rep.*) is cited, who considers this law in question as a reprisal, and prohibited by the constitution, and who gives the defendant, who was a party in that suit, some wholesome advice. The chancellor seems to think all countervailing legislation is a reprisal. In the suit in which the present plaintiff was prohibited by Chancellor Kent, from navigating the waters in question, (4 *John. Chan. Rep.* 48) he grants the injunction expressly on the ground, that New York had asserted such exclusive jurisdiction to the waters of the Hudson. The act of their legislature, in which it was so asserted, passed in 1808. *John. Chan. Rep.* 48. Our act, asserting a territorial jurisdiction to the middle of the river, passed in 1807. *Rev. Laws* 533. Their act was subsequent to ours; was an act of countervailing legislation, and, of course, a reprisal, and unconstitutional in the opin-

ion of the chancellor, as since expressed. It remains for that enlightened jurist to reconcile his decision in the one case, with his opinion expressed in the other.

The judicial power of the federal government, it is said, extends to this case, and, therefore, our law is unconstitutional. 1. The judicial power does not extend to the injury. It can give this state no redress. Our citizens are injured by a law of New York, which is supposed to be constitutional; they are shut out from participating in the intercourse between the two states by employing steamboats. This is not a common law injury; a federal court can only redress such injuries as one state may receive from another in violation of some common law principle. There is no legislative power given to the federal government over the states, to create new and extraordinary remedies for the injuries which one state may sustain from the oppressive legislation of another. The only way to meet and prevent such injuries, is by countervailing legislation.

2. If the judicial power of the federal government did extend to the case, yet it does not *impliedly* take this power from the state. They are concurrent; there is no manifest repugnancy in the power of a state to redress herself by conflicting legislation, and her power to resort to a judicial tribunal for redress. Such concurrent powers are familiar to the law. A man may enter upon lands, or bring ejectment, may seize his personal property in the possession of another, or bring trover for it. 3 *Black. Com.*

The defendant's counsel also rely upon that clause in the constitution which says, that full faith and credit are to be given to the acts, records and judicial proceedings of a foreign state. By this it is meant, that they shall have the effect of record evidence, and conclusive as to the fact. The terms, faith and credit, convey the idea of evidence. It relates only to the degree of evidence which is to be attached to foreign acts and judicial proceedings, and was not intended to give them any greater operation and efficacy than they

had before. At common law, many acts and judgments of foreign states were carried into effect in England. All statutes of foreign countries concerning marriages, and all marriages pursuant to them, would be recognized in England if the parties should come there, and the reciprocal duties of husband and wife would be enforced. All judgments of foreign countries, founded on contracts, and where there is a moral obligation to perform them, would be enforced in England. But the mere positive laws of a foreign state, accompanied with no antecedent moral obligation, and judgments founded on them, are never enforced or regarded at common law, but, on the contrary, if injurious and oppressive upon the subjects of Great Britain, they are retorted upon by their parliament. This doctrine, which is illustrated by Huberus, is not peculiar to England, but is adopted in all civilized countries, and prevailed in these states when the federal constitution was adopted. The records of foreign judgments, however, were not *conclusive* evidence of the debt, but they might be rebutted. This provision in the constitution was intended to make such records of a foreign state, as, upon the principles then prevailing, were enforced in a state court, conclusive, and not merely *prima facie* evidence of the debt. It was not intended to give to the acts and judicial proceedings of a foreign state any greater efficacy or operation than they had before. It addresses itself to the *courts* of a state, and lays down for *them* a rule of *evidence.* It is not addressed to the state legislatures, to deprive them of the power of counteracting the oppressive legislation of a foreign state. If it imposes any restraint upon the state *legislatures*, it does it only *impliedly*, and only so far as to prevent them from restraining the operation and efficacy of such foreign acts and judicial proceedings of a sister state as were enforced by law, when the constitution was adopted. The order in question of the chancellor of New York, authorizing the injunction of which we complain, was not such a decree as would, upon common

law principles, have been enforced in our courts before the adoption of the federal constitution, and, of course, this clause of the constitution does not apply to it.    But,

2. Admitting for the sake of argument, that we have no right to retort, by our acts, upon the oppressive legislation of the state of New York, and that the judicial proceedings of their state are to have a binding operation in our state, and cannot be contravened here, still we contend that the statute of New Jersey in question is constitutional.   New Jersey, as before observed, has an exclusive territorial right to the middle of 'the bay of New York, and of the Hudson, so far up as her territories extend along that river, and a common right of navigation over every part of those waters. The claim of New York to those waters, to the exclusion of New Jersey, is founded upon the idea, that the grant from the duke of York to Berkley and Carteret, does not embrace those waters, or any part of them.   Considering it as a transfer of a territory, with the powers of government, made for great public purposes, and to be construed upon the principles of public law, no jurist can doubt the correctness of the claims of New Jersey.   New York also sets up a sort of prescriptive right, derived from long continued possession. But such a possession, if it could have such an effect, should have been exclusive, whereas it is notorious that the citizens of New Jersey have always used those waters.    Though the respective territorial rights are several, each state going to the *filum aquæ*, yet the right of navigation is common between the two states.    Formerly all the rights of two nations, as well territorial as otherwise, in a navigable water, which was the boundary between them, were common and undivided.    *Grotius B.* 2, *chap.* 3, *sec.* 8.    And the right of navigation must, in the nature of things, still continue common, otherwise it could not be enjoyed.    The vessels of a nation could not navigate on one side of the *filum aquæ.* Upon these principles we settled with Pennsylvania in 1782, in respect to the Delaware (*Rev. Laws,* 57,) principles

reasonable, fair and equal. The laws of New York, then, giving this monopoly, do not extend to the waters in question, so far as respects the citizens of New Jersey. New York has no power to legislate over the rights of this state, either of territory or navigation, and any decision of a court of New York, attempting to extend this monopoly thus far, is *void*, as against New Jersey and her citizens, and we, under our statute, may recover damages for the proceedings of the defendant under such *void* decision.

It is said, that though New York cannot grant a monopoly on our side of the *filum aquæ*, yet they may on our side. She may regulate, and we must enjoy subject to such regulation. I admit, that the mere right of the citizens of New Jersey, or of any other state, to use the waters of New York, *as derived from the federal constitution*, is subject to such regulation. But New Jersey, as a *state*, and independently of her privileges under the federal constitution, (and this is a view of the subject to which the defendant's counsel has not adverted) has this common right.

In the famous dispute about the navigation of the Scheldt, which agitated Europe in the last century, the claims of the emperor Joseph, which were strongly supported, would have been indisputable if he had owned the territory on one side of that river to its mouth of navigation. This right of navigation in New Jersey, over these waters, is a public right, and part of the public domains of the state. See *Hale's Treatise* in *Hargrave's Law Tracts*, and *Mundy v. Arnold, ante* 71, 76. One state cannot legislate over the rights of another state. They are equal and co-ordinate. *Vattel Prelim. sec.* 18. New York may pass laws regulating her territorial rights to the *filum aquæ*, but not so as to bind the right of navigation in New Jersey and her citizens. The right of territory in public waters is subordinate and secondary. There is no modern Neptune who can command the waves to retire while the earth below yields forth her fruits. The right of navigation, especially in a commer-

cial country, is everything. Even the public personal property of one sovereign in the territories of another is exempt from the jurisdiction of the latter. *The Schooner Exchange* v. *M'Faddon et al.* 7 *Cranch* 116. When the Chancellor of New York, then, attempts to restrain, by injunction, a citizen of New Jersey from navigating these waters with steamboats, on the ground that the exclusive right of such navigation is vested by the New York laws in certain monopolists, he goes farther than those laws will warrant, because those laws do not, and cannot affect the common right of navigation in the state of New Jersey and her citizens; and when the chancellor attempts thus to affect them, he steps beyond his jurisdictional limits, and, of course, his proceedings are *void.* Admitting a valid decree of the chancery of New York may not be impugned in this state, yet a void decree, which is *coram non judice,* unquestionably may.

It may be said, that our courts have no right to question the jurisdiction of the Chancellor of New York; that he had a right to judge of the extent of the operation of the New York laws, and whether New Jersey really has a common right of navigation over the waters in question, which those laws cannot reach; and that if he has erred, the plaintiff must resort to the federal courts by way of appeal. But there is no doubt, that a court of co-ordinate powers may decide collaterally upon the *jurisdiction* though not upon the regularity, of another court; and if it appears that the latter stepped beyond its jurisdiction, it will consider its proceedings as void. Admiralty courts consider the judgments of foreign admiralty courts as final and conclusive, but still they reserve the right to inquire, first, whether the latter are properly constituted? and second, whether they have jurisdiction over the *subject matter?* *Rose* v. *Himely,* 4 *Cranch* 241. Suppose New York, by statute, should assert a right to the whole county of Bergen, and her chancellor should decree possession of certain lands in that county to be delivered to the plaintiff, in a suit before

him, by means of which the occupier should be turned out of possession; if the latter should bring trespass in our court, could the party to that decree rely upon it as a defence, and would our court be shut out from inquiring into the constitutionality of that decree and the jurisdiction of the chancellor? If so, one state, by its statutes and decrees, can completely suspend the jurisdiction of another state, to any extent, until the latter can get a decision in its favor in the federal court.

It is said, that New York has a right to pass laws regulating her ports. Suppose she has, and that our common right of navigation may be affected by such port regulations, yet it will not be pretended, that these monopoly laws were passed for that purpose, and can be protected by that view of the subject.

It is said, that if our claim, as spread upon the pleadings, is valid, yet the plaintiff has not supported his issue. On a demurrer to evidence, the court will draw, in favor of the plaintiff, every conclusion which a jury might have drawn. 2 *Tidd's Practice* 794.

It is objected, that the injunction in the present case was not served after the operation of the law. In answer to this we say—1. The injunction was served after the passage of the law; the *operation* of the law only was suspended till the 1st of April, 1820. The service of the injunction is no part of the operation of the law. 2. The act says, if any citizen shall be *restrained or enjoined, &c.* It is immaterial when the injunction was *served*, if the operation of it *continues* the plaintiff is restrained: But it is said, the defendant should have done some positive act of enjoining; that is not necessary. Upon a fair construction of our statute, it was his duty, in order to exempt himself from its operation, to do all, when requested, which ought to be done on his part to put an end to the injunction. He is called upon for that purpose, and declines giving any answer. An actual refusal is not necessary. *Durell* v. *Mother*, 8 *John.* 445.

His subsequent petition to the chancellor shews his intention to continue the injunction. If A. should erect a nuisance on his land to the injury of B. and should afterwards sell to C., on request C. is bound to abate the nuisance. *Penruddock's case* 5, *C.* 101. In the present case, Livingston was bound, under the statute, to put an end to his injunction. When called upon to do so, he refuses to give an answer, and suffers his injunction to continue.

It is said, that this is not the kind of injunction contemplated by our act; that it refers to a statutory injunction; and that this injunction issued upon the great general principles which regulate courts of equity in such cases. Our act does not require that the law of New York shall expressly authorize and direct the injunction to issue. It is sufficient that a law of New York is either the real or colorable foundation upon which a citizen of New Jersey shall be restrained by such injunction from navigating the waters in question. A chancellor of New York would not restrain the citizens of New Jersey from the exercise of this right, if he did not think the laws of New York gave the exclusive right to the monopolists. If they do not expressly direct the injunction, yet they lay the foundation upon which alone the injunction is granted, and, of course, a citizen of New Jersey may be said to be restrained either by virtue, or under color, of such laws; by *virtue* of them, if they really give the monopoly over these waters, and under *color* of them, if they do not really give such a monopoly, but are erroneously construed to do so by the chancellor.

This act is not penal, but remedial, and is to be liberally construed. It gives damages only; the costs are treble, because, as the plaintiff is put to the proof of acts in a foreign state, he is subjected to extraordinary expenses.— Costs are in their nature remedial; they are intended to reimburse a party, and they never do completely reimburse him. Besides, if the costs are penal, the other part of the statute, giving the remedy, is remedial, and is to be liberally

construed.   You are, in such cases, to look to the mischief.
A citizen of New Jersey, when this law passed, could not
be restrained by a statutory injunction in New York.   The
only case in which such injunction was expressly directed,
was in the case of a forfeiture, and there could be no for-
feitures under their laws after the death of Fulton and
Livingston, the original grantees.

I have confined myself, in these observations, to that
section of our statute on which this suit is founded.   If any
other parts of the statute should be considered unconstitu-
tional, which it is unnecessary now to discuss, and this
section is valid, it is sufficient for our purpose.

*Ogden*, in reply.   The great question is, whether this
defendant, who is a citizen of New York, can be made liable
to damages *here*, for a lawful transaction *there*, in execution
of a decree or judgment of a court of competent jurisdiction
of that state?   In support of the action, it has been con-
tended—

I. That it is founded upon a statute of New Jersey to
resist encroachments upon its *territory* and *jurisdiction*,
under color of statutes of the state of New York.

1. As to territory.   The state of New Jersey, by a statu-
tory declaration, admits the boundary line between the two
states to be the midway of the intermediate waters, and no
statute of the state of New York has been, or can be pro-
duced, which declares her territory to extend beyond the
middle of the bay, lying between the Jersey shore and Long
Island.   The statute of New York, of April, 1808, (the
only statute on the subject,) gives jurisdiction to the city
and county of New York over certain offences, within the
Hudson river and " the bay between Staten Island and
Long Island," excluding, as evidently appears from the
maps, that part of the bay which lies between Bergen
Neck, on the Jersey shore, and the shores of Long Island,
in the state of New York, so that no part of the route

Gibbons *v.* Livingston.

between New York and New Brunswick (within which the trespass is laid to have been committed) falls within the *asserted* statutory claim of New York, and, consequently, is not within the purview of that statute of New Jersey on which the present suit is founded. It has been said, however, that certain commissioners, on the part of New York, laid claim to the whole of the intermediate waters to high water mark on the New Jersey shore, but this fell short of the requirement of our statute. So, on the other hand, the commissioners on the part of New Jersey claimed Staten Island, and the whole waters, to high water mark, on the shores of New York, but neither state, by statute, ever asserted claims co-extensive with those made by their respective commissioners.

Again, it has been said, that the Chancellor of New York declared, in his decree, that the territory of New York extended over the whole bay; still, however, if this were so, it falls short of our statute, which requires, that the restraint should be in virtue, or under color, of some *statute* of the other state.

Besides, it is not laid, in the declaration, neither was it proved, that plaintiff was ever restrained from navigating any of the waters which have been declared, by New Jersey, to be within its territory, between the cities of New Brunswick and New York, from which it is evident that the restraint complained of was a restraint within the territory of the state of New York, and so, *also*, not within the purview of our statute, made in support of the jurisdiction of this state, for it is the duty of this court to infer, that the legislature never intended to support its own jurisdiction by punishing citizens of New York for acts done in that state, in execution of a decree or order of a court of competent jurisdiction there. To infer the contrary, would be to say, that the legislature meant to break in upon that fundamental principle of public law, whereby no sovereign

power has any right to interfere with the *lex loci* or *lex fori* of any other state. *Vattel B.* 1, *chap.* 4. *sec.* 6; *Ib. sec.* 46.

2. As to jurisdiction. It has been contended, on the other side, that New York has no jurisdiction, unless concurrently with New Jersey, over this intermediate navigation; that the act of New Jersey of January, 1811, now repealed, made a declaration to that effect; and that a royal grant of a river was in trust for the whole public, and could not affect their common rights of navigation and of fishery.

In answer, it may be observed—1. That it is an established principle of public law, that the jurisdiction of every sovereign state is co-extensive with its territory over waters intermediate between it and another sovereign state. *Vattel B.* 1, *chap.* 22, *sec.* 3; *Marten* 159, 165; *Hargrave* 10.

2. The state of New Jersey has been in the constant practice of exercising jurisdiction over such parts of these intermediate waters, which she claims to be within her own territory, and very particularly, in the act upon which the present suit is founded. What can be more inconsistent than to ask this court to exercise a statutory jurisdiction over those parts of these waters which fall within its territory, and at the same time deny that the courts of New York have a similar right? This is really to blow hot and to blow cold in the very same breath. Besides, it is believed, that every state in the Union is in the constant exercise of the like jurisdiction.

3. It is a mistake to say, that the laws of New York, intended to be resisted by our statutes, give a preference to the citizens of that state; because their citizens, equally with ours, are bound by the operation of those laws. And so, likewise, under the constitution of the United States, the citizens of every state are liable to the same disabilities; and entitled to the same privileges as the citizens of the state in which they may happen to be. *Tros Tyrius que: nullo discrimine agetur.*

See *Constitution of the United States, art.* 4, *sec.* 2, which provides " that the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states."

II. It has been urged, on the other side, that the statute of New Jersey can be defended on the principle of retortion or retaliation, as found in public law; that these are rights incident to sovereign power, rights which have not been expressly prohibited by the federal constitution, and which, consequently, remain in the several states, respectively, as before its adoption.

In answer, it may be observed—1. The general principle, as found in Vattel, must necessarily vary, according to the subject matter to which it is to be applied. The rule *do as you would be done by*, is equally a principle of public law as this, that *you may do as you are done by*, and, if applied without restriction, would step in between the criminal and judge, and justify retaliation in its most extensive forms. "*Est modus in rebus, sunt certi denique fines, ultra, citraque nequit consistere rectum.*" If foreign tonnage be exacted, the nation which pays it may, by way of retortion, adopt a similar regulation in regard to the nation which receives it. So if one nation prohibit intercourse from her ports to other nations, such other nations may retort the measure by similar regulations from their own ports. So, likewise, if one nation should refuse to consume the corn of other nations, they may retort·by saying, we will not consume your cloth. In the foregoing cases, each party exercises a *perfect right*, and no party can complain if others exercise the same rights towards him that he exercises in regard to them, and this is in no way inconsistent with that *moral* principle which is the basis of all public law. In this view of the subject, New Jersey might grant similar exclusive privileges, upon good and sufficient consideration, but it cannot extend this principle so far as to punish a citizen of that state, or any other citizen, for exercising a franchise

granted to him by that state, declared valid by its highest. judicial authorities, and sanctioned by the decrees and judgments of *all* its courts, which have had the proper cognizance of the subject matter. Such an extension of this principle has no foundation in reason, and is supported by no precedent, or even analogy, in that public law which has been set up against us.

Suppose the state of New York should grant a several fishery, a case which has been mentioned, in her own territory, and the grantee should vindicate his right, by action in its court, against a citizen of this state, either by injunction or execution, and this state should pass a law making such grantee liable, in New Jersey, on that account, for all the losses which such citizen of New Jersey may have sustained by reason of his having been so prevented from disturbing such grantee in the enjoyment of his franchise, so declared to be valid and lawful, could such an act of our legislature possibly be justified upon that principle of retortion, as found in public law? If so, this principle would destroy public law itself, by making acts done in every state, in pursuance of its laws and judgments of its courts, examinable and punishable in the courts of every other state. I might put the case under the same circumstances of an exclusive right, in nature of a *ferry*. Is it possible to suppose that a statute of New Jersey could be supported on the ground of *retortion*, which would punish in New Jersey the grantee of such ferry for exercising the right of his franchise against a *Jerseyman*, as well as against his own fellow citizens? Many other analagous cases might be put, and if public law be as contended for on the other side, then I can see no reason why, upon the principle of retortion, (that is as is said, in all cases, to do as you are done by) a law could not be supported authorizing any citizen of New Jersey, from whom a debt had been recovered in New York, to recover back from his creditor the whole money *here*, and that too with double, or even triple costs.

Suppose the state of New York should imprudently adopt this same principle of retortion, and authorize a recovery, in that state, *by* this defendant *against* this plaintiff of double the sum that may be recovered here, with double costs, where would all this end ? Retortion would lead to retaliation, and retaliation to more direct hostilities, but for the control of that federal constitution, under which, happily for the peace and concord of these states, each one is *firmly* placed, and for the execution of which, and the preservation of all its benefits, every court within the Union is *firmly* bound by the highest obligation. 1 *Federalist* 27, 32, 33, 34, 40.

III. For the sake of the argument, which I by no means admit, let us suppose that this act of New Jersey could be justified among nations wholly independent of each other, upon the principles of *retortion* and *retaliation*, as found in the treatises on public law; yet I contend, that this act cannot be supported under the laws and constitution of the United States, which, on all hands, is admitted to be the supreme and paramount law of the land.

*Art. 4, sec. 1, of the Federal Constitution* provides, " that full faith and credit shall be given, in each state, to the *public acts, records,* and *judicial* proceedings of every other state, and that congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the *effect* thereof."

*Art.* 6, of the same constitution, further provides, " that this constitution, and the laws of the United States made in pursuance thereof, shall be the *supreme* law of the land ; and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." And " that the judicial officers, both of the United States and the several states, shall be bound, by oath or affirmation, to support this constitution."

1 *Vol. of the Laws of Congress* 15, passed in pursuance of the foregoing article of the constitution, provides, " that such

records and judicial proceedings shall have *such* faith and credit given to them in every court within the United States, as they have by law or usage in the courts of the state from whence the said records are, or shall be taken.

It has been argued, however, by the adverse council, that the above provision does not extend to the *effect* which such records and judicial proceedings shall have in other states. In opposition to this, it is only necessary to observe, that it has been solemnly decided, as well in this court as in the Supreme Court of the United States, that under the foregoing act of congress the *effect* of a judgment shall be in every state the same as in the state in which it was rendered. *Wheat. Dig.* 119. *Cranch* 481, 483. 3 *Wheat. Rep.* 234.

The declaration in this suit, and the exemplified acts and judicial proceedings referred to therein, and shewn in evidence, prove that the state of New York, in pursuance of a contract between it and Messrs. Livingston and Fulton, and their assigns, made to them a grant for the exclusive use of steamboats on all the waters within its territory and jurisdiction, for a limited time, on consideration of their having brought such navigation into practical use, and of their having undertaken to keep up, for public use, a certain number of such boats on the North River, to run between the cities of New York and Albany. That Messrs. Livingston and Fulton assigned to John R. Livingston, the defendant, in the year 1808, a portion of that exclusive right in the territory of New York for the purpose of running steamboats, among other places, between the cities of New York and New Brunswick. That after Mr. Livingston, the defendant, had been in the undisturbed enjoyment of this right for more than ten years, he was interrupted therein by the plaintiff, Mr. Gibbons, by his running, without any license, his steamboat, the Bellona, between the cities of New Brunswick and New York, over waters in the territory, and within the jurisdiction, of that state. That this

defendant filed his bill in chancery, in the state of New York, against Mr. Gibbons, complaining of such interruption, and praying relief; and that such court, by an interlocutory order or decree, granted an injunction against the present plaintiff, Mr. Gibbons, whereby it appears that he was restrained from running his boat between the cities of New Brunswick and New York, as he before had done.

The declaration further shews the act of the legislature of this state of February, 1820, which provides, that if any citizen of New Jersey shall *hereafter* be restrained or enjoined by any order or decree of the Court of Chancery of New York, in virtue, or under color, of any act of the legislature of that state, from navigating the waters between the ancient shores of the two states, that, in such case, the party so restrained shall, in an action of trespass, recover all damages sustained thereby, with triple costs, against the plaintiff in such order or decree.

It is perfectly evident, that the provisions of the above statute of New Jersey would give, in this court, an effect to judicial proceedings in the state of New York directly and diametrically opposite to the effect they would have in the courts of the state of New York, from whence they have been taken, for *there* they would be a complete justification in a suit for the restraint complained against, whereas *here* they are made the very basis and foundation of the action. Thus it turns out, that this statute of New Jersey comes in direct collision with an act of congress, made in pursuance of the constitution of the United States, and it is certainly unnecessary to add, that the latter must be considered as the paramount law, and that it ought to be the inclination, as it is the duty, of the court to protect the defendant from the penalties of an act which is not only at variance with fundamental principles, but expressly repugnant to the supreme law of the land.

Let me, however, suppose otherwise for a moment, and that the act of our legislature and the act of congress are

in perfect accordance. This act is highly penal, and it fol-lows, if there be any dubiety in the terms made use of, that they must be taken in the stricter sense, and so as not to have any retroactive operation.

The terms of the act are, "if any citizen of the state of New Jersey shall *hereafter* be *enjoined* or *restrained* by any writ of injunction or order of the Court of Chancery of the state of New York," &c. Now there is no charge, in the declaration, of any restraint after the 1st of April, 1820, when the operation of the law commenced, nor of any injunction whatever, excepting the one which was sued out in the month of May, in the year preceding the law of New Jersey, and served in the month of March, between the passage of the law and the time when it went into opera-tion. The question here is, whether the words, "*shall here-after*," in our act, do not apply to the whole of the sentence immediately following, so as to mean only a restraint in virtue of some subsequent injunction or order of the chan-cery of New York.

1. The natural sense of every antecedent, is to cover the whole of the subsequent, sentence, unless opposed to the evident meaning of the parties.

2. If the word "*hereafter*" does not apply to the *order* of the court in New York, it can have no operation what-ever, for then the whole clause would have precisely the same meaning if the word was wholly omitted. This is contrary to the plain rule of construction, that every word, if *possible*, must have its natural effect. Suppose the terms of the act had been, if any citizen of the state of New Jersey shall "*hereafter*" be restrained of his liberty, by any writ of *ca. sa.* out of any court in the state of New York, is it not the natural sense, that to make a plaintiff *there*, liable *here*, that the writ should have been sued out after the passage of the law? or must he, as is contended on the other side, go immediately and release the defendant, and so extinguish his debt? Such a course could not be

required, even if the words "*shall hereafter*" had been omitted, without giving the law a retroactive operation in destruction of a vested right, and in hostility with natural justice and every principle of fair and reasonable construction, but the words "*shall hereafter*" evidently shew that such could not have been the intent of the legislature.

3. If there be only a doubt as to the *effect* which these words, "*shall hereafter*," ought to have upon the construction of this clause of the statute, that which is the most favorable to the defendant ought to be adopted, inasmuch as the law is highly penal, and, to say the least of it, of a novel and very extraordinary character.

On the other hand it has been contended, that this law ought to have the most favorable construction; that it is *remedial* and grew out of the necessity of the case, as there was no other mode to resist the encroachments on the part of New York, which have been so loudly complained of. Has it been shewn how this law can have any possible tendency to settle this disputed line?

Why (under our federal constitution, which declares, *art.* 3, *sec.* 2, that the judicial power shall extend to controversies between two or more states, and that in such case the Supreme Court shall have original jurisdiction) may not the state of New York be impleaded in that court by the state of New Jersey, and so bring this controversy to a final end? This only legal and constitutional remedy has never been tried, and there has never been, that I have ever heard of, any legal opinion against its efficacy. Why, then, talk *here* of the necessity of this *warfare* against an individual, an innocent individual, acting in strict conformity to the laws of the state in which he resides? Why, then, talk here of retortion and retaliation, to the ruin of individuals, the interruption of a great public accommodation, and all the numerous evils necessarily consequent, when the doors are open to courts fully competent? If this be proper, in regard to the state, why ought not individuals, out of the

same plea of *necessity,* instead of vindicating their rights in courts, resort to the like measures of retortion and retaliation ?　I am sorry that this plea of necessity was ever set up as an argument in favor of a construction which cannot be maintained on ordinary rules.

So, also, in regard to the complaint of an encroachment on *jurisdiction,* this plea of *necessity* has as little to do as in regard to the question of *boundary.*　If the claim be well founded, it stamps *nullity* on the next section of this act, for there our own legislature has exercised jurisdiction over its own territory in these intermediate waters, by prohibiting a licensed commerce between this state and that of New York, notwithstanding the provision in *art.* 1, *sec.* 8, of the constitution, "that Congress shall have power to regulate commerce among the several states," and this without any such reason as has been urged in favor of the grant of the state of New York to Messrs. Livingston and Fulton for this exclusive right, on the ground of the property which Mr. Fulton had in his own combination, and on account of which his name will live through all posterity.　Now, can the state of New Jersey lawfully exercise this very jurisdiction over her waters, and deny the same right to the state of New York in her waters ?　Whether New York could constitutionally make that grant in favor of a meritorious citizen of the United States, (in consideration of the introduction, by him, into practical use of a navigation unknown in all former times, and of which the benefits are incalculable) is a constitutional question, now regularly depending before the Supreme Court of Washington, on appeal from the court of the last resort in the state of New York.　And why not wait the event with patience ? a virtue necessary for every suitor, as well as the plaintiff in this cause.　What is there in *his* case which should require that all ordinary rules should be lost sight of, and the plea of necessity set up, of which the great characteristic is, that it knows no rule.

I conclude by observing, that this suit is brought for a supposed transgression in the territory of the state of New York; that the basis and entire foundation of the suit is a transaction in the state of New York, in execution of a lawful judgment or decree of the Court of Chancery *there ;* that the statute of this state, and constitution of the United States, and the act of congress made in pursuance thereof, are in direct collision, inasmuch as the effect of such judicial proceedings are, by the law of New Jersey, made diametrically opposite to the effect such proceedings would have in the state of New York, from whence they have been taken; that the apparent unconstitutionality of our law could not be justified on any ground of retortion and retaliation; that the courts of the United States had full power to hear and determine every matter in controversy between this and our neighboring state; that, independently of the matters just mentioned, the fair construction of our statute could not comprehend the case of an injunction issued before the statute and the necessary consequences thereof; that this statute is highly penal in its nature, and ought to receive the most favorable construction in behalf of the defendant; and that there is nothing in the supposed necessity of the case to alter the ordinary plain rules of construction thereto, and, therefore, I now pray that the judgment of the court may be entered for the *defendant.*

KIRKPATRICK, C. J. This is an action on the case, brought by the plaintiff to recover damages against the defendant for enjoining and restraining him from navigating, with his steamboat, the waters between the state of New Jersey and the state of New York. It is founded on the third section of the act entitled, " A supplement to the act entitled an act to preserve and support the jurisdiction of this state," passed February 25, 1820.

This section is in these words, that is to say, " If any citizen of the state of New Jersey shall *hereafter* be enjoined

or restrained by any writ of injunction, or order of the
Court of Chancery of the state of New York, *by virtue, or
under color, of any act of the legislature of that state,* from
navigating, with any boat or vessel moved by steam or fire,
belonging or to belong, in part or in whole, to him, the
waters between the ancient shores of the states of New
Jersey and New York, the plaintiff or plaintiffs in such writ
or order shall be liable to the person or persons aggrieved
for all damages, expenses, and charges occasioned thereby,
to be recovered, with triple costs, in an action of trespass,
or trespass on the case, in any court having cognizance
thereof," &c.

The cause was brought to trial at the Middlesex Circuit,
in December last, when the plaintiff gave in evidence the
acts of the legislature of the state of New York granting
and securing to the persons therein named the exclusive
privilege of navigating the waters of that state by steam ;
the proceedings of the Court of Chancery there upon a bill
filed by the defendant against the plaintiff, complaining of
an infringement of that exclusive privilege ; a writ of injunc-
tion sued out by the order of that court, commanding the
plaintiff to desist and refrain from navigating, with his
steamboat, the *waters in the bay of New York and in the
Hudson river, between Staten Island and Powles Hook,*
and, afterwards, by another order, limited to the waters of
the bay of New York only, under the penalty of ten thou-
sand dollars, until the further order of that court to the
contrary ; and the service of that writ on the plaintiff some
time in June, 1819, at Staten Island, in the state of New
York.   He also gave in evidence some other things, rather
of a formal nature, and not here necessary to be men-
tioned.   To this evidence the defendant demurred, and
that demurrer is now subjected to the consideration of this
court.

To support this demurrer, the defendant takes these three
grounds :—1. That the enjoining and restraining, proved on

the trial, was by an injunction sued out and served before the passing of this act ; that the defendant has done no act or thing, since that time, to enforce that injunction, or carry it into effect, or in any way to enjoin or restrain the plaintiff thereby ; and that, therefore, the plaintiff does not bring himself within the words of the act, which says, " if any citizen of New Jersey shall *hereafter* be enjoined or restrained by any writ," &c.

2. That the enjoining and restraining proved on the trial, even though the injunction had been sued out and served after the act went into operation, would not be within the description and prohibition contained in it, because that injunction was not *by virtue, or under color, of any act of the legislature of New York,* but according to the ordinary course of proceeding of a court of chancery in the exercise of its ancient and essential jurisdiction, and so is not within the words of the act, " an injunction *by virtue, or under color, of any act of the legislature of New York.*"

3. That the defendant being a citizen of the state of New York, and acting within that state and under its judicial authority, cannot be called in question, or subjected to damages, in another state for such act.

As to the first of these grounds. It is to be observed, that the operation of a writ of injunction is not confined to the time of its service, nor to any limited time afterwards, but continues until it is regularly dissolved by the authority under which it is issued. In this case, the plaintiff could not, at any time within the period complained of, navigate these waters, with his steamboat, without subjecting himself to an attachment for contempt ; without subjecting himself to the imprisonment of his person and to the payment of the penalty expressed in the writ. Can it be said, then, that he was not restrained during that whole period ; that he was not restrained, as well after the act went into operation as before ? It was not necessary that the restraint should *commence* after the act went into operation, in order to

bring it within the words; if it *continued* afterwards, if the plaintiff was actually restrained afterwards, he is, in my view of the case, as clearly within the words of it as if the injunction had been sued out and served afterwards. The defendant was the party restraining; the injunction was in his hands; he kept it in operation; he was continually acting; he was restraining every day; and if he would have avoided the penalty of this act he must have removed the restraint, he must have dissolved the injunction.

As to the second ground. It must be admitted, that in order to entitle a citizen of New Jersey to an action under this section, the enjoining and restraining, spoken of, must be by a writ of injunction, or an order of the Court of Chancery of the state of New York, *by virtue, or under color, of some act of the legislature of that state;* and it must be admitted, also, that the injunction in this case was not specially directed by any such act, but that it was sued out according to the usual course of the court in the exercise of its ancient and essential jurisdiction. But though this be so, yet it may be said, I think, that it is *by virtue, or under color,* of these acts, or some one of them. They do not, it is true, grant a special power to issue an injunction upon the infringement of this exclusive privilege; the court, from time immemorial, had that power in all cases of that kind, and, therefore, stood in no need of such special grant in this particular one, but they do create the right upon which that power is exercised; it is *by virtue of,* or upon the strength of that right, thus created by these acts, that the defendant comes into that court to demand this writ; and it is by virtue of that right, and that alone, that the chancellor could grant it. And it is beyond all controversy, from the whole scope of the act, that it was in this light the legislature viewed it. They meant to prohibit, totally, the taking out of an injunction to secure this exclusive privilege against us. The injunction may, therefore, I think, fairly be said to be *by virtue,* or upon the strength of these acts, or some one of them. They lie at the bottom of the whole proceeding.

The third ground is, that a citizen of one state, acting within that state, and under its laws and judicial authority, cannot be called in question for such act in any other state.

This position would appear *to me* to be well founded in the constitution of the United States. The constitution declares, that *full faith and credit shall be given, in each state, to the public acts, records, and judicial proceedings of every other state.* These words, *full faith and credit,* in this clause of the constitution, so far as they apply to judicial proceedings, have been construed in this court, as well as in the Supreme Court of the United States, to imply *full force and effect;* that is, *such force and effect as they have by law or usage in the state from whence they are taken.*

Now, if this action had been brought in the state of New York, as well it might, and these judicial proceedings in the Court of Chancery had been given in evidence there, as they have been here, and the defendant had demurred to that evidence, could there be a doubt but that the demurrer must have been adjudged to be conclusive against the plaintiff? It must have been so, even though erroneous, upon the principle, that the judgment of a court having jurisdiction of the subject matter must always be conclusive, until reversed upon error, or corrected upon appeal. And if so, how shall we avoid giving them the same force and effect here? In ordinary cases, it would seem that there could be no doubt on this subject. If a citizen of New Jersey should be sued in New York upon an account for goods sold, or upon a bond or promissory note, or other matter of debt arising here, and should have judgment against him and execution upon his goods, and then should bring an action here to recover damages for the taking and detaining such goods, would any man say, that the judicial proceedings against him in the state of New York would not be conclusive against him here, would any man hesitate to say so, even if the state of New Jersey should, before that time, have passed an act giving an action to recover damages in

such cases? No man, it is thought, would hesitate to say so, because such act would be manifestly not only contrary to the spirit of the federal compact, but also to the very words of it, which have been already cited. What, then, is there in the case before us to vary it from the common case? If it should be said, that the laws of the state of New York granting this exclusive privilege, and excluding the steamboats of other states from their waters, are unconstitutional laws; or if it should be said, as the commissioners for settling with New York the eastern boundary of the state have said, that, independently of the constitution, all navigable rivers and arms of the sea are, in a certain sense, common to all the citizens of the United States, for that all have a common right to their navigation, and a common right to sail through their waters, even though they cover the land of another state; or if it should be said, that the law of the state of New York extending the boundary of that state, and asserting its exclusive jurisdiction up to high water mark on our shores, and so carrying their exclusive privilege and jurisdiction into our territory, is wholly without color of right; and that, therefore, the judicial proceedings of the Court of Chancery of that state can never be admitted, either to establish and give effect to such unconstitutional laws, or to impugn and take away such common right, and least of all, to sanctify such encroachment upon our territory, and such usurpation of our sovereign authority. And if it should be admitted that all these things are so, (concerning which, however, I give no opinion at present) yet must it not be admitted, also, that the courts of that state have lawful jurisdiction of all questions arising on the laws of that state, subject only to an appeal to the courts of the United States; and that unless such appeal be actually made, their judgments must be final and conclusive, and have the same *faith and credit*, that is, the same *force and effect* here, as they would have had there?

Gibbons *v.* Livingston.

Whether the state of New York had or had not a right to grant this exclusive privilege; or in any way to regulate or restrain her commerce with other states; or to interdict their intercourse by water in any manner they might think fit; are questions *arising under the constitution of the United States:* for independent of that constitution there can be no doubt but they had such right; whether the enforcement of that exclusive privilege against the plaintiff, who is a citizen of New Jersey, is a violation of any common right which he might have had, independently of the constitution, to navigate the waters of that state, is a question *arising between citizens of different states;* so, also, of questions arising upon their law of boundary and jurisdiction, for every private controversy growing out of it must necessarily be, as it is here, between citizens of different states. So that in all the cases put, and in all the cases that can be put, so far as my imagination can carry me, the courts of New York have, upon these laws, unquestionable jurisdiction, subject to an appeal to the courts of the United States; and if so, what reason can be offered that their judicial proceedings should not have full force and effect here as well as there? The constitution of the United States expressly provides, that the judicial power shall extend to all controversies arising under the constitution and laws of the United States; all controversies between two or more states, and between citizens of different states, or of the same state, claiming rights under different states; thus making provision and establishing tribunals for the determination of all controversies of this kind, and, indeed, of every kind which can arise between the different states, or the citizens thereof, and especially those which arise upon the constitution itself. Can a state, then, which has agreed to this compact, and which has complete remedy in the tribunals of justice thereby established, resort to measures of force? can it, for every supposed injury, become its own judge, and retort such injury upon the supposed aggressor, or make recaptions or

reprisals by way of indemnificaticn ?   What sort of a fede-
ral compact would this be, and how long could it possibly
endure ?

To me it would appear, therefore, that the only constitu-
tional mode of obtaining redress against these unconstitu-
tional laws and judicial proceedings of the state of New
York, and the acts done under them, if indeed they are
unconstitutional, would be by appeal to the courts of the
United States, where all questions of this kind may be set-
tled by intelligent and disinterested judges, and all ground
of controversy between different states, and the citizens
thereof, be removed and taken away.

But notwithstanding the subject presents itself to my
view in this light, yet inasmuch as it is understood that the
chancellor, who is the judge in a co-ordinate court, over
which this has no control, and to whom the execution of
this act is specially and principally committed, has so far
adjudged it to be a constitutional act, as to carry it into
effect in sundry instances and to great extent; and inas-
much as it highly concerns the dignity of the republic, as
well as the rights of private citizens, that the administra-
tion of justice should be uniform, and that the construction
of the laws should be the same in all the courts, I have felt
myself constrained to doubt the correctness of my own
judgment, and to yield to that high authority.

I am willing, therefore, upon this ground to say, that this
demurrer must be overruled, and that judgment must be
entered for the plaintiff.   .

RossELL J.   The constitutionality of the law of this state
has been brought in question by the defendant, and this
court, on that ground, strongly urged to stay its operation.
This is always a question of the greatest delicacy and
importance, bringing, perhaps, into mischievous collision the
organized authorities of our country.   The represntatives
of a free people, elected to make laws for the regulation of

their own conduct, as well as that of their own constituents, know no limits to their authority but their own consciences and the constitutions of the United States and of New Jersey, and a law passed by them must be in direct violation of one or both these sacred charters ere a court would be authorized to declare it void. Although it might be inclined to the opinion, that it was an infringement of the spirit of those instruments, this would be setting up the understandings of a few to that of the many, in a *doubtful* question, for doubtful it might well be considered when the collected wisdom of a whole country had, after due deliberation, passed upon it, and declared, by a solemn public act, that it was within the limits of their powers; and a court might with propriety be accused of arrogantly assuming to themselves a superiority of intelligence and patriotism in setting up their own opinions in opposition to it, and thus defeat, perhaps, the operation of a beneficial public law. If we might be permitted to suppose a legislative body so regardless of their duty, their oaths, and the fundamental charters of their country as to wantonly violate them, there are but few courts, I trust, that would lend their aid to support a usurpation of power so unjust in itself, and so ruinous to our best interests. The subject matter of this law has been for many years, from time to time, before the legislators of this state, repeatedly discussed and acted upon, after due deliberation, and is not of a description that would at all justify this court to stay its execution. It has, in principle, received the sanction of successive legislative bodies, composed of different members; has been put in execution by the Court of Chancery, and this court is bound, I conceive, to execute it on all proper occasions. But it is urged, that it is a direct violation of the constitution of the United States, as that declares, " that full faith and credit shall be given, in each state, to the public acts and judicial proceedings of every other state;" and that the defendant is now prosecuted in

this court for putting in force, in New York, against the plaintiff, a *public act* of that state. But this clause of the constitution has been grossly misunderstood, not only in this, but in other states, if it compels us to *submit* our rights, our persons, nay the sovereignty of our states, to the unjust usurpation of a foreign legislature, who might be induced to pass a public act to their destruction. An officer of New York, under color of a law of that state, has served compulsory process, on a citizen claiming the protection of this state, on our own shores. Was New Jersey to submit to this violation, under a plea, that *full faith and credit was to be given to a public act of New York?* I presume this will not be pretended. Nor will it be denied, that our legislature, (when, in 1807, they passed an act, called the mother act, to preserve the jurisdiction of this state, and making it highly penal to serve such process) were fully justified in so doing in the opinion of every Jerseyman. So when New York, in effect, claimed the exclusive right and jurisdiction to all the waters 'of New York bay and Hudson river. The. legislature of New Jersey, in 1811, by another act of that date, declared, " that whereas the state of New York does unjustly claim an exclusive jurisdiction over all the waters lying between the shores of the two states; and whereas the citizens of New Jersey have a full and equal right to navigate vessels or boats on all the waters lying as aforesaid, &c., therefore, if any citizen of this state should have his boat, moved by fire or steam, seized on those waters, under color of any law of the state of New York, the party so injured might seize on any steamboat belonging to a citizen of New York, lying and being in any river, creek, or bay; the whole waters whereof are within the territorial jurisdiction of New Jersey, exclusive of New York, which boat should be forfeited, unless," &c.

In 1813, in consequence of another law of New York, an act was passed in New Jersey more effectually to enforce that of 1811. In 1818, a supplement to the mother act of

1807 was passed, making it the duty of, and offering a reward to, the citizens of this state to apprehend all offenders against the first recited act. In all the foregoing, we see the labors of our legislature altogether on the defensive, following from time to time, and step by step, the previous laws and proceedings of New York, in defence of the rights of New Jersey, from what we deem the unjust pretensions and encroachments of New York; and, until these conflicting claims are decided against us by a competent judicial tribunal, it would be a dereliction of an imperious duty should we abandon them. It is true, that by the law of 1807, the exclusive jurisdiction of New Jersey is confined to the middle of the Hudson; but that law by no means gives up the right of navigation on all the waters leading to and from the sea that it may be necessary to pass and repass in order to the full and perfect enjoyment of a privilege so essential to our interests and happiness. This right we claim by the law of nature and of nations, as well as by grant from the duke of York to the proprietors of East Jersey, in 1682, " of the free use of all bays, rivers, and waters, leading unto, or lying between, New York, &c., and East Jersey, for navigation, free trade, fishing, or otherwise."

The law, on the third section of which this action has been brought, was in force from the 1st of April, 1820, and enacts, " that if any citizen of New Jersey shall hereafter be enjoined or restrained by any writ of injunction, or order, of the Court of Chancery of New York, by virtue, or under color, of any act of the legislature of that state, from *navigating,* with any boat or vessel moved by fire or steam, or fire, belonging to him, the waters between the ancient shores of New York and New Jersey, the plaintiff in such writ or order shall be liable to pay all damages sustained by the person aggrieved, with triple costs," &c. This act, being in some degree penal in its nature, should be strictly construed, and it is incumbent on the plaintiff to bring himself within its express provisions.

On the *postea*, it is returned, as proved by the plaintiff, " that in March, 1820, his steamboat, the Bellona, was fitted out to run from New Brunswick to the port of New York, through and over the waters between the ancient shores of New Jersey and New York, for the transportation of freight and passengers, and that he kept her so fitted from the 8th of May until the 5th of June, 1820 ; that from the 30th of March to the 5th April she was employed carrying passengers from New Brunswick to the Nautilus, when the captain of the latter refused to receive them, &c.; that from the fifth of April to the 25th of June she was laid up, and not used ; that on the 25th of April she began to run to the steamboat Nautilus, at Staten Island, carrying passengers for New York ; but that the intervening time, between the 8th of May, and the 5th of June, 1820, the plaintiff was restrained, by force of the said injunction of the defendant, from running his steamboat, the Bellona, into the port of New York, or any part of the bay of New York, although during that period he intended to pass with said boat from New Brunswick to New York, over the bay of New York, lying between the ancient shores of New York and New Jersey, if he had not been restrained by the injunction aforesaid."  By the above proof it appears, that the plaintiff complains, that from the 8th of May to the 5th of June, 1820, he was restrained, by an injunction obtained by the defendant from the Chancellor of the state of New York, from running the Bellona from New Brunswick to the port of New York, over the waters lying between the ancient shores of the two states, for which he claims damages.

When the legislature of New Jersey passed the law of 1820, for the security of our citizens navigating the bay of New York and the waters between the ancient shores of the two states, they did not intend any interference with the right of the state of New York to interdict an entrance into her own ports, unless on such terms and in such manner as she by law had prescribed. New Jersey herself had so often

Gibbons *v.* Livingston.

exercised a similar power, that she could not, with a shadow of propriety, dispute that power merely because it was exercised by a sister-state, and that too after her own example. Nor have the legislature so, in terms, expressed themselves; nor could they, for a moment, doubt the right of New York to grant to whom she will the exclusive right of entering her own ports, in the manner prescribed for the advancement of a public good. If this right is denied to New York, in vain may New Jersey search for that so repeatedly exercised by herself, both alike possessed of all the inherent rights of sovereignty, not yielded but in the manner set forth in the constitution of the United States; neither presumes to assume a power over the other. Whilst contending about rights, each believing justly their own, they claim no superiority, nor acknowledge themselves inferior sisters of a great and happy confederation. Interest, duty, and good faith, in the most imperative terms, forbid it. If the plaintiff had confined himself, for the purposes of navigation, to the waters claimed by New York, there is no pretence that he would have been disturbed. Nay, it was stated on the argument, and not denied, that he run the Bellona to Powles Hook without interruption. But he expressly declares his purpose was to enter the port of New York, claiming a privilege by virtue of a law of this state, which was denied to the citizens of that. The *gist* of his complaint, and on which only he founds his claim to damages, arises altogether from his being restrained from carrying freight and passengers, in the Bellona, to and from that port. He, indeed, also states, that he was restrained from passing over the waters lying between the two states, but for what purpose did he desire this passage? Solely that his great object, a free entry into the port of New York, might be attained, and that too in open defiance of her laws. It is one thing, to merely navigate those waters; another, to enter the port of New York. He connects these together, and we cannot disjoin them. His purpose, as respects New York, was an

unlawful one; nor is it authorized by the law on which this action is brought, or any other law of this state. No word or sentence of the law of 1820 will bear such a construction. But if, by an ingenious and forced construction, it could be said to imply a power, such as is demanded by the plaintiff, no court would believe that the legislature of New Jersey could have intended to commit so unprecedented a violation of the rights and sovereignty of a sister state; and as it is the manifest *intention* of the law makers that gives a direction to courts, their decisions would be in conformity to that *intention.* Nay, if the law, in terms, had authorized the purposes of the plaintiff, we are not without authority to shew that our courts are bound not to execute a law repugnant to the first principles of justice. 1 *Black. Com.* 91—" If there arise out of a law, collaterally, any absurd consequences manifestly contradictory to common reason, they are, with regard to those consequences, void. Thus if an act of parliament gives a man power to try all causes within his manor of Dale, yet if a cause should arise in which he is a party, the act is construed not to extend to that, because it is unreasonable that any man should determine his own quarrel."

It is laid down, as the law of nations, in *Vattel* 201–2, 215–17. " Nations are forbid to hurt or offend any other nation, or in way create disturbance or foment discord. Nothing is more opposite to the duties of humanity, nor more contrary to the society which should be cultivated by nations, than offences or actions which give a just displeasure, that we should avoid them if possible. A few medals and dull jests against Louis XIV. occasioned a war which brought the United Provinces to the brink of ruin. It is a necessary consequence of the independence of nations, that all have a right to be governed as they may think proper, and none have the least authority to interfere in the government of another state, or set itself up as a judge of its conduct. Of all the rights that belong to a nation, sover-

eignty is the most precious, and that which others ought the most scrupulously respect if they would not do an injury." These principles are classed, by that celebrated writer, amongst the *perfect* rights of nations.

New Jersey claiming, for the reasons before mentioned, a right to the navigation, free trade, fishing, &c., in the specified waters of New York, contends only for *these*, regulated by the general law, applicable to the subject matter she is in the exercise of, and not in defiance of all law. If, when under the colonial government of Great Britain, a subject of the colony of New Jersey had chosen to violate the revenue laws of New York, could he have set up, as a legal defence, the right of navigation, founded on the law of nations, the common law of England, or the grant from the duke of York? Since the declaration of independence, and our total emancipation from the government of Great Britain, when each of the thirteen states became completely sovereign in its own right, could such an offender against the laws successfully claim an exemption by a pretension like that? It will not, I presume, be contended, in either case, that the plea would have been of any avail. New York, then, became fully possessed of all the inherent rights of a sovereign power; and, unless in joining our great family compact she has surrendered these particular rights, she still retains them. I see nothing in the constitution of the United States that sanctions a belief that they are surrendered. Two sections of that instrument, only, appear to bear on this subject; the one regulates commerce, the other secures to the citizens of all the states the rights of citizens in each individual state, but. *no more.* What is prohibited to a citizen of an individual state, no citizen of another state can be justified in practicing there. New York, without contradiction or complaint, *now* has her port regulations established by law; her wharf, river or bay regulations, her quarantine laws, &c.; can a citizen of New Jersey expect to enter her ports in direct violation of any, or all these, per-

haps, in the pursuit of some supposed profitable speculation, and carry a mortal contagion into her ports and make desolate her capital. None can be hardy enough to support a proposition so absurd. Deeds for land, bonds or contracts under seal, are solemn instruments; but if made in contradiction to the public policy or interest, or with unlawful intentions, they are declared void. A man may have a right of way over my lands, but if he is using this right only for the avowed purpose of burning my buildings, destroying my enclosures, or injuring my family, his right of passage will not avail him in an action, for that I had taken measures, without force, to prevent the completion of his nefarious object.

If we, as a people, by the universal law of nations, have no possible right to control or violate the laws of an unconnected independent sovereignty, as a member of a great confederacy established for the express purpose " of a more perfect union to establish justice, ensure domestic tranquility, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity." New Jersey is peculiarly bound by the strongest of all ties, self-preservation itself, to cleave to the constitution of the United States, as the sheet anchor of its existence as an independent power, and " give full faith and credit to the public acts and judicial proceedings of our sister states," when not in violation of that independence; a contrary conduct, persisted in, would prostrate long settled public principles, founded on immutable justice, violate the laws and sacred charter of our confederacy, and jeopardize, not only the peace and happiness, but the very existence, of our republic.

The purpose of the plaintiff is *openly avowed;* to consummate that *unlawful* purpose *only,* was he desirous of navigating the waters between the two states. He declares, that he was restrained from its completion, not by force or violence, but by an *injunction* out of chancery; and I cannot

perceive any principle of law, justice, or public policy, that should entitle him to recover damages; and think, therefore, that judgment ought to be entered for the defendant.

FORD, J. concurred with the Chief Justice.

Demurrer overruled.